**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WILLIAM CARTER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. ) |
| LOGMEIN, INC., ROBERT M. CALDERONI, WILLIAM R. WAGNER, EDWIN J. GILLIS, STEVEN J. BENSON, DAVID JAMES HENSHALL, PETER JOHN SACRIPANTI, MICHAEL J. CHRISTENSON, ITA M. BRENNAN, and SARA C. ANDREWS, | ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) ) ) |

Plaintiff William Carter ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of LogMeIn, Inc. ("LogMeIn" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with LogMeIn, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between LogMeIn, Francisco Partners and Evergreen Coast Capital Corporation ("Evergreen"), the private equity affiliate of Elliot Management Corporation.

2.     On December 17, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $86.05 in cash for each share of LogMeIn stock they own (the "Merger Consideration").

3.     On January 17, 2020, in order to convince LogMeIn shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading preliminary proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.     In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that LogMeIn shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by LogMeIn's financial advisors, Qatalyst Partners LP ("Qatalyst") and J.P. Morgan Securities LLC ("J.P. Morgan") in support of their opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to LogMeIn shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because LogMeIn is incorporated in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of LogMeIn common stock.

12.     Defendant LogMeIn is incorporated in Delaware and maintains its principal executive offices at 320 Summer Street, Boston, Massachusetts 02210.  The Company's common stock trades on the NASDAQ under the ticker symbol "LOGM."

13.     Individual Defendant Robert M. Calderoni is LogMeIn's Chairman and has been a director of LogMeIn since January 2017.

14.     Individual Defendant William R. Wagner is LogMeIn's President and Chief Executive Officer and has been a director of LogMeIn since March 2015.

15.     Individual Defendant Edwin J. Gillis has been a director of LogMeIn since November 2007.

16.     Individual Defendant Steven J. Benson has been a director of LogMeIn since October 2004.

17.     Individual Defendant David James Henshall has been a director of LogMeIn since January 2017.

18.     Individual Defendant Peter John Sacripanti has been a director of LogMeIn since January 2017.

19.     Individual Defendant Michael J. Christenson has been a director of LogMeIn since August 2010.

20.     Individual Defendant Ita M. Brennan has been a director of LogMeIn since November 2018.

21.     Individual Defendant Sara C. Andrews has been a director of LogMeIn since April 2018.

22.     The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of LogMeIn (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of January 10, 2020, there were approximately 49,000,000 shares of LogMeIn common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of LogMeIn will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

        ii)      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

        iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.     The Proposed Transaction

25.     LogMeIn provides its customers with unified communications and collaboration, identity and access management, and customer engagement and support solutions. The Company introduced its first cloud-based connectivity offering in 2004 and has since used this technology to expand the type of devices and data that can be accessed remotely, while introducing a variety of cloud-based offerings or applications designed to address the needs of today's unified communications and collaboration, identity and access management, customer engagement and support markets.

26.     On December 17, 2019, LogMeIn, Francisco Partners and Evergreen issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

BOSTON, Dec. 17, 2019 (GLOBE NEWSWIRE) -- LogMeIn, Inc. (NASDAQ: LOGM), a leading provider of cloud-based connectivity, today announced that it has entered into a definitive agreement (or the "Agreement") to be acquired in a transaction led by affiliates of Francisco Partners, a leading technology-focused global private equity firm, and including Evergreen Coast Capital Corporation ("Evergreen"), the private equity affiliate of Elliott Management Corporation ("Elliott"), for $86.05 per share in cash. The all-cash transaction values LogMeIn at an aggregate equity valuation of approximately $4.3 billion.

Under the terms of the Agreement, LogMeIn shareholders will receive $86.05 in cash for each share of LogMeIn's common stock they hold. This consideration represents a premium of approximately 25% to LogMeIn's unaffected closing stock price on September 18, 2019, the last trading day before a media report was published speculating about a potential sale process. The Board of Directors of LogMeIn approved the Agreement and recommended that shareholders vote in favor of the transaction.

"This transaction acknowledges the significant value of LogMeIn and provides our stockholders with a meaningful and certain cash offer at a compelling premium," said Bill Wagner, President and Chief Executive Officer of LogMeIn. "Together, Francisco Partners and Evergreen are committed to addressing the unique needs of both our core and growth assets. We believe our partnership with Francisco Partners and Evergreen will help put us in a position to deliver the operational benefits needed to achieve sustained growth over the long term."

"LogMeIn has a compelling product portfolio and leadership in the Unified Communications and Collaboration, Identity, and Digital Engagement markets," said Andrew Kowal, Senior Partner at Francisco Partners. "We look forward to working with Bill and the leadership team at LogMeIn to accelerate growth and product investment organically and inorganically."

"This investment builds on the strength of our infrastructure and security software franchise and we are thrilled to partner with the company to achieve its long-term strategic vision," added Dipanjan "DJ" Deb, co-founder and CEO of Francisco Partners.

"We have deep appreciation for the LogMeIn franchise and leadership team from our long-term involvement in the business," said Elliott Partner Jesse Cohn and Portfolio Manager Jason Genrich. "We look forward to partnering with Bill and the entire executive leadership team alongside Francisco Partners on the next phase of growth and value creation for LogMeIn as a private company."

Christine Wang, Principal at Francisco Partners also commented, "We are excited to invest in LogMeIn and support its mission to deliver best-in-class software solutions to the modern workforce."

The transaction is expected to close in mid-2020, subject to customary closing conditions, including the receipt of stockholder and regulatory approvals.

The definitive agreement for the transaction includes a customary 45-day "go-shop" period which permits LogMeIn and its advisors to actively solicit alternative acquisition proposals, and potentially enter negotiations with other parties that make alternative acquisition proposals. LogMeIn will have the right to terminate the definitive agreement to accept a superior proposal subject to the terms and conditions of the definitive agreement. There can be no assurance that this process will result in a superior proposal, and LogMeIn does not intend to disclose developments with respect to the solicitation process unless and until its Board of Directors makes a determination requiring further disclosure.

Qatalyst Partners and J.P. Morgan Securities LLC are acting as financial advisors to LogMeIn, and Latham & Watkins LLP is serving as the company's legal advisor.

Mizuho Bank, Ltd. is acting as lead financial advisor and Barclays, Deutsche Bank Securities, Jefferies LLC, and RBC Capital Markets are acting as co-financial advisors to Francisco Partners and Evergreen with Paul Hastings LLP, Kirkland & Ellis LLP, and Gibson, Dunn & Crutcher LLP serving as legal advisors. Barclays, RBC Capital Markets, Deutsche Bank Securities, Jefferies Finance LLC, and Mizuho Bank, Ltd. have provided committed debt financing for the transaction.

**About LogMeIn**

LogMeIn, Inc. (Nasdaq: LOGM) simplifies how people connect with each other and the world around them to drive meaningful interactions, deepen relationships, and create better outcomes for individuals and businesses. One of the world's top 10 public SaaS companies, and a market leader in unified communication & collaboration, identity & access management, and customer engagement & support solutions, LogMeIn has millions of customers spanning virtually every country across the globe. LogMeIn is headquartered in Boston with additional locations in North America, South America, Europe, Asia and Australia.

**About Francisco Partners**
Francisco Partners is a leading global private equity firm that specializes in investments in technology and technology-enabled businesses. Since its launch 20 years ago, Francisco Partners has raised over $15 billion in committed capital and invested in more than 275 technology companies, making it one of the most active and longstanding investors in the technology industry. The firm invests in opportunities where its deep sectoral knowledge and operational expertise can help companies realize their full potential. For more information on Francisco Partners, please visit: www.franciscopartners.com

**About Elliott and Evergreen**
Elliott Management Corporation manages two multi-strategy investment funds which combined have approximately $38 billion of assets under management. Its flagship fund, Elliott Associates, L.P., was founded in 1977, making it one of the oldest funds of its kind under continuous management. The Elliott funds' investors include pension plans, sovereign wealth funds, endowments, foundations, funds-of-funds, high net worth individuals and families, and employees of the firm. This investment is being led by Evergreen Coast Capital, Elliott's Menlo Park affiliate, which focuses on technology investing.

27.     LogMeIn is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual

economic loss (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading Proxy

29.    On January 17, 2020, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

30.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.   Here, the Proxy discloses that "[i]n connection with LogMeIn's evaluation of a possible transaction, LogMeIn management prepared certain non-public, unaudited, stand-alone financial projections." Proxy 68-69. The projections were provided to the Board, Francisco Partners and Evergreen, and Qatalyst and J.P. Morgan. *Id.* at 69.

31.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial

information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

33.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.     Here, LogMeIn's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine that the "value offered to stockholders pursuant to the Merger is more favorable to LogMeIn stockholders than the potential value from other alternatives reasonably available to LogMeIn, including remaining an independent public company . . . ." Proxy 53.

35.     As discussed further below, the non-GAAP financial projections used do not provide LogMeIn's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

36.     The Proxy discloses that "[i]n connection with LogMeIn's evaluation of a possible transaction, LogMeIn management prepared certain non-public, unaudited, stand-alone financial projections." *Id.* 68-69. The projections were provided to the Board, Francisco Partners and Evergreen, and Qatalyst and J.P. Morgan. *Id.* at 69.

37.     The Proxy further discloses the Company's management believed that the "numerous variables, assumptions and estimates as to future events made by our management . . . were reasonable at the time the Management Projections were prepared, taking into account the relevant information available to management at the time the Management Projections were prepared." *Id.* at 70.

38.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2025 for:

(1) Non-GAAP Revenue, (2) Non-GAAP Gross Profit, (3) Non-GAAP Operating Income, (4) Adjusted EBITDA, (5) Adjusted Free Cash Flow, (6) Unlevered Free Cash Flow Pre SBC Excluding One-Time Cash Charges, (7) Unlevered Free Cash Flow Pre SBC, and (8) Unlevered Free Cash Flow Post SBC but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 69.

39.     The Proxy discloses Revenue and Gross Profit, but in the associated footnote immediately renames them as non-GAAP Revenue and Gross Profit. *Id.* at 61 n.1. The footnote explains that "Non-GAAP Revenue and Gross Profit exclude the impact of any fair value acquisition accounting adjustments on acquired deferred revenue, transaction- and acquisition-related costs and amortization, litigation-related expense, stock-based compensation expense, and restructuring charges." *Id.* Nevertheless, the Proxy fails to reconcile non-GAAP Revenue or Gross Profit to their most comparable GAAP measures or disclose the line items used to calculate the terms, rendering the use of non-GAAP Revenue or Gross Profit materially false and/or misleading. *Id.*

40.     The Proxy defines non-GAAP Operating Income as "GAAP net income (loss) from operations adding back the impact of the fair value acquisition accounting adjustment on acquired deferred revenue, transaction- and acquisition-related costs and amortization, litigation-related expense, stock-based compensation expense, and restructuring charges." *Id.* at 69 n.2. Nevertheless, the Proxy fails to reconcile non-GAAP Operating Income to its most comparable GAAP measure or disclose the line items used to calculate non-GAAP Operating Income, rendering the use of non-GAAP Operating Income in the Proxy materially false and/or misleading. *Id.*

41.    The Proxy defines Adjusted EBITDA as "GAAP net income (loss) excluding interest and other (expense) income, net, income taxes and depreciation and amortization expenses and adding back the impact of the fair value acquisition accounting adjustment on acquired deferred revenue, acquisition-related costs, litigation-related expense, stock-based compensation expense, restructuring charges and gain or loss on disposition of assets." *Id.* at 69 n.3. Nevertheless, the Proxy fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the use of Adjusted EBITDA in the Proxy materially false and/or misleading.  *Id.*

42.    The Proxy defines Adjusted Free Cash Flow as "GAAP cash flows from operating activities less purchases of property and equipment and intangible asset additions and adding back litigation-related payments, restructuring payments, transaction- and acquisition-related payments and any discrete integration-related tax payments." *Id.* at 70 n.4.  Nevertheless, the Proxy fails to reconcile Adjusted Free Cash Flow to its most comparable GAAP measure or disclose the line items used to calculate Adjusted Free Cash Flow, rendering the use of Adjusted Free Cash Flow in the Proxy materially false and/or misleading.  *Id.*

43.    The Proxy defines Unlevered Free Cash Flow Pre SBC Excluding One-Time Cash Charges as "(i) Non-GAAP Operating Income, less (ii) cash taxes, less (iii) capital expenditures, plus (iv) depreciation and amortization expense, and plus (v) change in working capital." *Id.* at 70 n.5.  Nevertheless, the Proxy fails to reconcile Unlevered Free Cash Flow Pre SBC Excluding One-Time Cash Charges to its most comparable GAAP measure or disclose the line items used to calculate it, rendering the use of Unlevered Free Cash Flow Pre SBC Excluding One-Time Cash Charges in the Proxy materially false and/or misleading.  *Id.*

44.     The Proxy defines Unlevered Free Cash Flow Pre SBC as "Unlevered Free Cash Flow Pre SBC Excluding One-Time Charges less other cash flow items related to litigation, restructuring and acquisition or disposition related cash payments." *Id.* at 70 n.6.  Nevertheless, the Proxy fails to reconcile Unlevered Free Cash Flow Pre SBC to its most comparable GAAP measure or disclose the line items used to calculate it, rendering the use of Unlevered Free Cash Flow Pre SBC in the Proxy materially false and/or misleading.  *Id.*

45.     The Proxy defines Unlevered Free Cash Flow Post SBC as "Unlevered Free Cash Flow Pre SBC less share-based compensation expense." *Id.* at 70 n.7.  Nevertheless, the Proxy fails to reconcile Unlevered Free Cash Flow Post SBC to its most comparable GAAP measure, rendering the use of Unlevered Free Cash Flow Post SBC in the Proxy materially false and/or misleading.  *Id.*

46.     Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

47.     The non-GAAP financial projections disclosed on page 69 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their

GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

48.      As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

49.      The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

50.      Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

---

[1]      Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).
[2]      Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.
[3]      SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").
[4]      SEC, *Final Rule.*

51.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as LogMeIn included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

52.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment

---

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/ filename1.htm.

Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

53.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

54.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences

---

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.     The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

55.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above. Indeed, Defendants acknowledge that "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in accordance with accounting principles generally accepted in the United States ("GAAP") and non-GAAP financial measures as used by LogMeIn may not be comparable to similarly titled amounts used by other companies."

56.     Moreover, the Proxy appears to be using GAAP compliant revenue and gross profit (as that is what they are called in the disclosed projections,) while they are really non-GAAP adjusted financial measures.

57.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

58.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 69, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

59.     The summary of the valuation methodologies utilized by Qatalyst and J.P. Morgan, including the utilization of certain of the non-GAAP financial projections described above by Qatalyst and J.P. Morgan, in connection with their valuation analyses, (*id.* at 57-58, 63-64) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading,

particularly as companies formulate non-GAAP metrics differently.  Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

60.    With respect to Qatalyst's fairness opinion, Qatalyst utilized third party research analyst estimates referred to as the Street Case. *Id.* at 58. None of the Street Case values have been disclosed. This information is material because when it was utilized in Qatalyst's *Selected Companies Analysis*, the Street Case values generated a higher per share value. *Id.* at 60. Shareholders need to know the Street Case values to ensure the disclosed projected financials are not overly pessimistic.

61.    Both Qatalyst and J.P. Morgan performed a discounted cash flow analysis on LogMeIn's discounted cash flows. With respect to Qatalyst's *Discounted Cash Flow Analysis*, the Proxy states that Qatalyst performed a DCF analysis of the Company by calculating the implied net present value of the Unlevered Free Cash Flow Pre SBC that the Company was forecasted to generate during calendar year 2020 through calendar year 2024 using a range of discount rates of 9.0% to 11.0%, based on the Company's weighted cost of capital. *Id.* at 59. Qatalyst also calculated the implied net present value of LogMeIn's terminal values by applying a range of fully diluted enterprise value to next twelve month estimated unlevered free cash flow multiples of 12.0x to 17.0x to the Company's calendar year 2025 estimated unlevered free cash flow and using a 9.0% to 11.0% discount rate range. *Id.* Qatalyst then added the Company's remaining cash balance and subtracted the estimated debt outstanding and divided by the fully diluted shares of the Company outstanding (calculated using the treasury stock method). *Id.*

62.    With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the proxy states that J.P. Morgan performed a DCF analysis on the Company using the Unlevered Free Cash Flow Post SBC that LogMeIn was expected to generate during fiscal years 2020 through 2029, with fiscal

years 2020 through 2025 coming from management's disclosed projections and fiscal years 2026 through 2029 being prepared by the Company's management but not disclosed in the Proxy. *Id.* at 67. J.P. Morgan also calculated a terminal value for the Company by applying a perpetual growth rate range of 2.0% and 3.0% to the Unlevered Free Cash Flow Post SBC LogMeIn was expected to generate during the terminal year. *Id.* J.P. Morgan discounted both the Company's expected Unlevered Free Cash Flow Post SBC and terminal value using a discount rate range of 7.75% to 8.75%, reflecting the Company's weighted average cost of capital. *Id.* J.P. Morgan then adjusted the present value of the Unlevered Free Cash Flow Post SBC for the Company's 2019 total net debt. *Id.*

63.    With respect to Qatalyst's DCF analysis, the Proxy does not disclose the calculated range of terminal values, the inputs and assumptions that went into the selection of the fully diluted enterprise value to next twelve month estimated unlevered free cash flow multiple range, any of the inputs that went into calculating the Company's weighted average cost of capital, the Company's net debt nor the number of fully diluted shares outstanding using the treasury stock method.

64.    With respect to J.P. Morgan's DCF analysis, the Proxy does not disclose management's projected Unlevered Free Cash Flow Post SBC for fiscal years 2026 through 2029, the calculated range of terminal values, the inputs and assumptions that went into the selection of the perpetual growth rate range, any of the inputs that went into calculating the Company's weighted average cost of capital, the Company's net debt nor the number of fully diluted shares outstanding.

65.    Since information was omitted, shareholders are unable to discern the veracity of Qatalyst and J.P. Morgan's discounted cash flow analyses.    Without further disclosure,

shareholders are unable to compare Qatalyst and J.P. Morgan's calculations with the Company's financial projections. The absence of any single piece of the above information renders Qatalyst and J.P. Morgan's discounted cash flow analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

66. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . " *Id.* (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

67. Moreover, Qatalyst and J.P. Morgan treated stock based compensation differently in their analyses resulting in the Merger Consideration falling in the middle of the range for Qatalyst's analysis, Proxy 59, and at the extreme bottom of J.P. Morgan's calculated range, *id.* at 67. The discrepancy is further compounded by Qatalyst and J.P. Morgan both calculating LogMeIn's weighted average cost of capital and either getting, or at the very minimum, applying, very different discount ranges. J.P. Morgan's analysis implies the per share price is worth approximately 10% more than what is implied from Qatalyst's analysis.

68.     Therefore, in order for LogMeIn shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

69.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from LogMeIn shareholders.

70.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

71.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
17 C.F.R. § 244.100 Promulgated Thereunder)**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

73.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

74.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

75.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

76.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

79.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

80.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

81.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

82. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

83. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

84. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

85. LogMeIn is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

86. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

87.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

88.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of LogMeIn within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of LogMeIn, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

90.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

92.     In addition, as the Proxy sets forth at length, and as described herein, that the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

93.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 24, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: */s/ Michael Van Gorder*
Michael Van Gorder (#6214)
3828 Kennett Pike, Suite 201
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*